FILED

2023 Jan-19  PM 02:07
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| REGINALD WOODS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cv-00505-RDP-JHE |
| | ) | |
| UNITED STATES OF AMERICA, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Reginald Woods has filed a *pro se* second amended complaint pursuant to the Federal Tort Claims Act ("FTCA") and *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), alleging violations of his rights under Alabama law and the United States Constitution. (Doc. 31). He names the following defendants in the second amended complaint: United States of America, Dr. W. Mark Holbrook, and Health Services Administrator Celia Hansen.[1] (Doc. 31 at 1). Woods seeks monetary relief. (Doc. 31 at 8–9). The second amended complaint is before the undersigned magistrate judge for a preliminary report and recommendation. *See* 28 U.S.C. § 636(b)(1); *McCarthy v. Bronson*, 500 U.S. 136 (1991). For the reasons to follow, the undersigned recommends the court grant defendants Holbrook and Hansen's motion to dismiss Woods's *Bivens* claims under 42 U.S.C. § 1997e(a) for failure to exhaust administrative remedies or, in the alternative, grant Holbrook and Hansen's motion for summary judgment on Woods's *Bivens* claims. The undersigned further recommends the court deny the United States's motion for summary judgment on Woods's FTCA claims, with leave to refile. Finally, the undersigned

---

[1] Incorrectly identified as Ceilia Hanson in the second amended complaint. (Doc. 31 at 1).

recommends the court grant Woods's renewed motions for appointment of counsel and appointment of an expert.  (Doc. 43 at 3–5).

## I.  Procedural History

Woods initially filed a complaint against the United States under the FTCA.  (Doc. 1).  On January 19, 2021, the undersigned entered an Order for Special Report, directing the United States to file a response to Woods's complaint within 60 days.  (Doc. 16).  Thereafter, Woods filed an amended complaint (doc. 26), and then a second amended complaint (doc. 31), alleging claims against the United States, Holbrook, and Hansen.  On December 8, 2021, the undersigned entered a Revised Order for Special Report, directing the Clerk to forward copies of the second amended complaint to each of the named defendants and requiring the defendants to file a Special Report addressing Woods's factual allegations.  (Doc. 32).

On February 28, 2022, the defendants filed a Special Report with supporting evidence.  (Docs. 40 & 41).  On March 1, 2022, the undersigned construed the Special Report as a motion for summary judgment and notified Woods that he had 21 days to respond to the motion for summary judgment by filing affidavits or other evidence. (Doc. 42).  The undersigned also advised Woods of the consequences of any default or failure to comply with Rule 56, (doc. 42).  *See Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir. 1985).  On March 14, 2022, Woods filed a response, along with renewed motions for appointment of counsel and an expert witness.  (Doc. 43).

This matter is now before the undersigned on the defendants' motion for summary judgment and Woods's renewed motions for appointment of counsel and an expert.[2]

---

[2] Woods's previous motion for appointment of an expert was denied without prejudice as premature.  (Docs. 14 & 24).

## II.  Standard of Review

Because the court has construed the defendants' Special Report as a motion for summary judgment, Federal Rule of Civil Procedure 56 governs the motion.  Under Rule 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In making that assessment, the court views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences against the moving party. *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000).  The moving party has the initial burden of showing there are no genuine issues of material fact and he is due to prevail as a matter of law.  *See Clark v. Coats & Clark, Inc*., 929 F.2d 604, 608 (11th Cir. 1991).  The plaintiff has the ultimate burden of proving his claims, so the moving party will be entitled to judgment as a matter of law on any claim unless the plaintiff is able to show some evidence supporting each element of that claim.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Bennett v. Parker*, 898 F.2d 1530, 1532–33 (11th Cir. 1990).  As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case.  In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.  Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof.  This rule facilitates the dismissal of factually unsupported claims prior to trial.

*Bennett*, 898 F.2d at 1532 (citations and internal quotations omitted).

In determining whether to grant summary judgment, however, the court will consider any "specific facts" pled in a *pro se* plaintiff's sworn complaint.  *See Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014) (citing *Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986)).  Additionally, because the plaintiff is *pro se*, the court must construe the

complaint more liberally than a pleading drafted by a lawyer.  *Hughes v. Rowe*, 449 U.S. 5, 9 (1980).

### III.  Summary Judgment Facts[3]

#### A.  Medical Defendants

Dr. Holbrook is currently employed by the Bureau of Prisons ("BOP") as Regional Physician for the Southeast Region and Acting Clinical Director at FCI-Talladega.  (Doc. 40-3, Holbrook Decl. ¶ 1).  Dr. Holbrook is board certified in Family Medicine.  (*Id*.).  As Clinical Director, Holbrook is the primary physician responsible for the clinical care of inmates at FCI-Talladega.  (*Id*. ¶ 2). Holbrook's duties include treating inmates, supervising other healthcare providers, and accessing inmates' medical records.  (*Id*.).

Hansen is currently employed by the BOP as Health Services Administrator ("HSA") at FCI-Lompac.  (Doc. 40-5, Hansen Decl. ¶ 1).  Hansen was employed as HSA at FCI-Talladega from September 18, 2016 to September 29, 2020.  (*Id*.).  As HSA, Hansen is responsible for planning, implementing, and directing all aspects of the Health Services Department's administrative functions.  (*Id*. ¶ 2).  Hansen provides supervision over all administrative issues in the department, including designation of shifts and assignment of general and specific duties.  (*Id*.).  In the ordinary course of her duties as HSA, Hansen is not responsible for providing clinical care to inmates, and she does not supervise the clinical care provided to inmates.  (*Id*.).

---

[3]  Based on the foregoing summary judgment standard, the following facts are undisputed or, if disputed, taken in a light most favorable to the non-moving party.  Factual disputes are addressed in footnote form.

### B. Woods's Medical Treatment

Woods was incarcerated at FCI-Talladega when the events underlying this action occurred. (Doc. 31 at 7).    Woods had a preexisting diagnosis of sickle cell retinopathy, which put him at high risk for retinal issues and decreased vision as a result.  (Doc. 40-3, Holbrook Decl. ¶ 12). According to a UAB Ophthalmology note dated January 25, 2018, Woods underwent a TRD repair/CEIOL (traditional retina detachment repair, cataract excision surgery) in or about 2015 and had two sutures left in place.  (Doc. 40-3, Holbrook Decl. ¶ 6, n.1; Doc. 41-1 at 87, 89).

On January 16, 2018, a suture in Woods's right eye "popped" and "impaled" his eye.  (Doc. 31 at 3).  Woods presented to morning sick-call where Mid-Level Practitioner Mourtada examined his eye and observed a visible suture.  (*Id*.).   Mourtada further noted that Woods was in pain and that his vision had decreased.  (*Id*.).   Mourtada requested an urgent ophthalmology consult for evaluation of a possible partial retinal suture detachment.   (Doc. 40-3. Holbrook Decl. ¶ 6). Mourtada prescribed Woods Tylenol #3 and eye drops but Woods did not receive the medications until evening pill call.  (Doc. 31 at 3).  By then, Woods's eye had swollen.[4]  (*Id*.).

Overnight, there was a "snow-storm," and no emergency medical employees were available. (Doc. 26 at 14, Woods Aff.).[5]  On the morning of January 17, 2018, Woods walked

---

[4] Woods's assertions concerning Mourtada's examination conflict with the medical records.  According to a January 16, 2018 Health Services Encounter note, Woods's eye pressures were normal at OD 14, OS 12, and there was no decrease in visual acuity.  (Doc. 41-1 at 41). Additionally, Mourtada did not note that he observed a suture in Woods's eye.  (Doc. 40-3, Hansen Decl. ¶ 6; Doc. 41-1 at 41).  Based on Woods's previous treatment records on December 14, 2017, visual acuity in his right eye was 20/60.  (Doc. 40-3, Holbrook Decl. ¶ 6; Doc. 41-1 at 64).  Because Mourtada noted there had been no change in visual acuity, it was determined that Woods's condition did not necessitate emergency treatment.  (Doc. 40-3, Holbrook Decl. ¶ 6).

[5] Woods attached two affidavits to his first amended complaint.   (Doc. 26 at 10–16). Because he references those affidavits in his second amended complaint (doc. 31 at 1), the undersigned will consider them along with the second amended complaint.

through snow to the medical building where he informed Dr. Holbrook and Hansen that his eye condition had deteriorated, and he was experiencing pain, pressure, and light sensitivity. (Doc. 26 at 14; Doc. 31 at 3–4). During the examination, Holbrook noted an inability to fully visualize the retina but did observe a "white stitch appearing substance" that protruded about 1/16–1/8 inch from the lateral aspect of Woods's right eye at the outer border of the iris. (Doc. 40-3, Holbrook Decl. ¶ 7). The examination also revealed Woods had mild erythema over the sclera of the right eye. (*Id*.). His visual acuity was 20/70. (*Id*.). Holbrook determined that Woods's condition did not require emergency attention because there still had been no significant change in his visual acuity. (*Id*.). Holbrook prescribed Woods Tylenol #3 for pain and antibiotic drops and advised him to return to the Health Department if his condition worsened. [6] (*Id*.). Woods did not receive the prescribed medications until the evening pill call.[7] (Doc. 31 at 4). By this time, Woods asserts his eye was "tearing itself apart." (*Id*.).

Woods reported his condition to Lieutenant Dougherty who directed medical staff to examine Woods immediately. (Doc. 31 at 4). Nurse Fred Honer examined Woods about 6:14 p.m. (Doc. 40-3, Holbrook Decl. ¶ 9; Doc. 41-1 at 35). Honer noted that Woods complained of a "different feeling" in his right eye, including pain, pressure, and loss of vision. (Doc. 41-1 at 35). Honer's examination noted a change in the visual acuity of Woods's right eye from 20/70 at 9:48

---

[6] Hansen states she was not responsible for the clinical care Woods received during the time frame of the allegations. (Doc. 40-5, Hansen Decl. ¶ 5).

[7] Medical records indicate Tylenol #3 was dispensed to Woods at 10:46 a.m. and again at 5:44 p.m. the same day. (Doc. 40-3, Holbrook Decl. ¶ 8; Doc. 41-1 at 47). Woods acknowledges in other pleadings that he received pain and antibiotic medications (doc. 26 at 3; doc. 31 at 4), but claims they were ineffective. (Doc. 26 at 3; Doc. 31 at 4). In his response to summary judgment, he asserts that he received "no treatment whatsoever for the pain or risk of infection." (Doc. 43 at 14).

a.m. to 20/200.  (Doc. 26 at 15, Woods Aff.; Doc. 41-1 at 35; Doc. 40-3, Holbrook Decl. ¶ 9).

Honer contacted Dr. Warren at Callahan Eye Hospital.  (Doc. 26 at 15, Woods Aff.).  Honer then

contacted Dr. Holbrook requesting approval to transport Woods to the emergency room for further

treatment and evaluation.  (Doc. 40-3, Holbrook Decl. ¶ 9).  Based on the results of Honer's

examination, specifically the sudden significant decrease in visual acuity, and the recommendation

of Dr. Warren, Holbrook approved Woods's transfer to the emergency room.  (*Id*.).

Woods alleges Holbrook and Hansen failed to give prison staff proper escorting

instructions.  (Doc. 26 at 12, Woods Aff.).  He also contends he was escorted without a coat despite

medical staff's knowledge that he suffers from sickle-cell anemia and that cold temperatures could

trigger a crisis.  (Doc. 26 at 12, 16, Woods Aff.).  Woods states that Dr. Lawrence previously

ordered that he not be exposed to any amount of "excess cold/wind" and that it was "well below

freezing" when he was escorted to the hospital, with nothing more than a t-shirt and pants. [8]  (Doc.

43 at 2, 19).

Mark Taft was employed as a Senior Officer Specialist at FCI-Talladega when the events

in the second amended complaint occurred.  (Doc. 40-4, Taft. Decl. ¶ 1).  Taft received Basic

Prisoner Transportation ("BPT") training and is certified to conduct inmate escorts.  (*Id*. ¶ 2).  Taft

is familiar with the policies and procedures in Program Statement ("PS") 5538.07, Escorted Trips.

(*Id*.).

On January 17, 2018, Taft and Officer Sanders were assigned to escort Woods to UAB

Hospital.  (Doc. 40-4, Taft. Decl. ¶ 5; Doc. 26 at 15, Woods Aff.).  Inmates are normally

transported to the nearest emergency room by ambulance.  (Doc. 40-4, Taft Decl. ¶ 5).  However,

---

[8] Dr. Holbrook asserts that Bureau policy does not require sickle cell patients be escorted with coats.  (Doc. 40-3, Holbrook Decl. ¶ 13).

due to Woods's need to see a specialist in Birmingham, he could not be transported by ambulance. (*Id.*).  Instead, Taft and Sanders transported Woods in a BOP vehicle.  (*Id.*).

Woods, Sanders, and Taft departed FCI-Talladega at approximately 7:44 p.m.  (Doc. 40-4, Taft. Decl. ¶ 5).  Upon arrival at UAB's emergency room, Woods was checked in at the front desk.  (*Id.*).  He and the officers remained in the waiting room until he could be seen.  (*Id.*).

After Woods had been handcuffed for three hours, Officer Sanders noticed Woods was in pain and asked Taft if they could remove Woods's C&S handcuff cover.  (Doc. 26 at 12, 15, 16, Woods Aff.; Doc. 40-4, Taft Decl. ¶ 6).  Taft refused because removing the cover violated BOP policy. [9]  (*Id.*).  Specifically, policy requires that the inmate remain secured with a C&S handcuff cover during hospital escorts.  (Doc. 40-4, Taft Decl. ¶ 6).  Prior to removing any restraints during an escort, Taft would have been required to contact an Operations Lieutenant to get approval.  (*Id.*).  Such approval is granted for procedures or exams, but not for general discomfort.  (*Id.*).  Taft did not contact an Operations Lieutenant for approval, and Woods's C&S handcuff cover remained intact.  (*Id.*).

After Taft, Sanders, and Woods had been in the waiting room for several hours, a physician notified Taft and Sanders that they were at the wrong location and Woods needed to be taken to the Callahan Eye Hospital, another UAB hospital located nearby.[10]  (Doc. 40-4, Taft Decl. ¶ 7).  As soon as they were advised that they were at the wrong emergency room, Taft and Sanders escorted Woods to Callahan Eye Hospital.  (*Id.*).  Woods maintains Holbrook and Hansen failed

---

[9] Woods contends the handcuff cover restricted his circulation due to his sickle cell anemia. (Doc. 26 at 12, 15, 16, Woods Aff.).

[10] Taft contends their initial stop at the wrong emergency department was unintentional, and due to the unusual circumstances of Woods's need to be transported to Callahan Eye Hospital as an emergency.  (Doc. 40-4, Taft Decl. ¶ 7).

to properly direct Taft and Sanders to transport him to Callahan Eye Hospital. (Doc. 26 at 12, Woods Aff.). When they arrived around 2:00 a.m., Taft and Sanders checked Woods in and experienced no further issues. (Doc. 31 at 4; Doc. 40-4, Taft Decl. ¶ 7). Woods's C&S handcuff cover remained intact as required by policy until he was examined. (Doc. 40-4, Taft Decl. ¶ 7).

When Woods was assessed, his vision had decreased to 20/400. (Doc. 41-1 at 94). Woods was diagnosed with endophthalmitis, "likely from a broken suture at temporal wound." (Doc. 41-1 at 95). Woods underwent surgery and his post-operative diagnosis was endophthalmitis and a corneal ulcer of the right eye. (Doc. 40-3, Holbrook Decl. ¶ 11). He returned to the prison on January 21, 2018, and underwent follow-up examinations at Callahan Eye Hospital as instructed. (Doc. 40-3, Holbrook Decl. ¶ 11; Doc. 41-1 at 77–85).

On March 1, 2018, Woods's visual acuity in this right eye was 20/30, which indicated no permanent damage to his vision in that eye. (Doc. 41-1 at 11; Doc. 40-3, Holbrook Decl. ¶ 12). Woods acknowledges that the surgery "corrected" his eye injury, (doc. 26 at 15, Woods Aff.), but contends he would not have had to suffer severe pain but for the defendants' delay and inaction (*id*. at 16).

### C. Administrative Remedies

The BOP maintains an administrative remedies procedure for inmates. *See* PS 1330.18, Administrative Remedy Procedures for Inmates; *see also* 28 C.F.R. § 542, Subpart B. The administrative remedies process provides inmates an opportunity for formal review of complaints related to imprisonment. (Doc. 40-6, Littlejohn Decl. ¶ 2).

To initiate the formal administrative remedies process, an inmate must first request an administrative remedy with the institution's Warden (BP-9, Level 1). (Doc. 40-6, Littlejohn Decl. ¶ 2). If dissatisfied with the Warden's response, the inmate may appeal the decision to the Regional

Director (BP-10, Level 2).  (Doc. 40-6, Littlejohn Decl. ¶ 2).  If the inmate is still dissatisfied, he may appeal to the General Counsel's National Inmate Appeals Office (BP-11, Level 3).  (Doc. 40-6, Littlejohn Decl. ¶ 2).  An inmate must exhaust all three levels of the administrative remedies process.  *See* 28 C.F.R. § 542.15(a) ("Appeal to the General Counsel is the final administrative appeal.").

On April 9, 2019, Woods filed a formal administrative remedy request (# 973771) to the Warden addressing the delay in medical care regarding his eye injury.  (Doc. 40-6, Littlejohn Decl. ¶ 4).  The Warden denied Woods's request on May 22, 2019.  (Doc. 1 at 21).  On June 17, 2019, Woods appealed to the Regional Director.  (Doc. 1 at 43; Doc. 40-6, Littlejohn Decl. ¶ 4).  On June 24, 2019, the Regional Director rejected Woods's appeal for failure to submit the appeal in the proper format.  (Doc. 40-6, Littlejohn Decl. ¶ 4).  The Regional Director noted that Woods did not provide a copy of his institution administrative remedy request (BP-9) form or a copy of the BP-9 response from the Warden.  (Doc. 1 at 42).  The Regional Director informed Woods that he could resubmit his appeal in the proper form within 10 days.  (Doc. 1 at 42).

On August 5, 2019, Woods appealed to the General Counsel.  (Doc. 1 at 44).  On August 30, 2019, General Counsel rejected the appeal because Woods filed it at the wrong level.  (*Id.*). General Counsel also concurred with the Regional Director's determination that Woods's appeal did not contain the necessary documents and directed Woods to follow the directions provided in the prior rejection notice.  (*Id.*).  Woods took no further action regarding his administrative remedies.[11]  (Doc. 40-6, Littlejohn Decl. ¶ 5).

---

[11] Woods contends that after the Regional Director rejected his appeal, he contacted his Unit Manager, who confirmed the proper documents were submitted.  (Doc. 43 at 3, 29).  Woods maintains the Regional Director "misrepresent[ed]" that his appeal omitted certain documents as a "delay tactic," (doc. 43 at 3) and merely employed the "usual game of hide and seek," (doc. 1 at 12).

## IV.  Analysis

Woods purports to bring his claims against the United States under the FTCA and against individual defendants Holbrook and Hansen under 42 U.S.C. § 1983.  (Doc. 31 at 8; Doc. 43 at 2). A suit brought under § 1983 challenges the constitutionality of actions of state officials.  *Abella v. Rubino*, 63 F.3d 1063, 1065 (11th Cir. 1995).  The United States Supreme Court in *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 389 (1971), recognized a similar cause of action for unconstitutional conduct by federal officials.  *See Kelly v. Serna*, 87 F.3d 1235, 1238 (11th Cir. 1996) (citations omitted) ("The effect of *Bivens* was to create a remedy against federal officers, acting under color of federal law, that was analogous to the section 1983 action against state officials.") (quotation marks and citation omitted).  Because Holbrook and Hansen are federal officials, Woods's lawsuit against them is properly brought under *Bivens*, not § 1983.  The undersigned will first address Woods's *Bivens* claims against defendants Holbrook and Hansen before turning to his FTCA claims against the United States.

### A.  *Bivens* Claims – Holbrook & Hansen

#### 1.  Administrative Remedies

The defendants contend that because Woods failed to exhaust his available administrative remedies prior to bringing this action, the court must dismiss Woods's *Bivens* claims against the individual defendants as a result.  (Doc. 40 at 30–33).  The undersigned agrees.

Title 42 U.S.C. § 1997e(a), as amended by the Prison Litigation Reform Act ("PLRA"), provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

The question of exhaustion under the PLRA is a "threshold matter" that federal courts must address before considering the merits of the case.  *See Chandler v. Crosby*, 379 F.3d 1278, 1286 (11th Cir. 2004).  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

In *Alexander v. Hawk*, the Eleventh Circuit Court of Appeals discussed the PLRA's amendment of 42 U.S.C. § 1997e, concluding that "Congress now has mandated exhaustion," and "exhaustion is now a pre-condition to suit [by a prisoner]."  159 F.3d 1321, 1325–26 (11th Cir. 1998).  Because exhaustion is mandated by the statute, a court has no discretion to waive this requirement.  *Id*.  The Supreme Court, interpreting the intent of Congress, concluded that exhaustion of administrative remedies is now mandatory even if the procedures do not meet certain "minimum acceptable standards" of fairness and effectiveness, and courts cannot excuse exhaustion even when it would be "appropriate and in the interests of justice."  *Booth v. Churner*, 532 U.S. 731, 740 n.5 (2001).

The Eleventh Circuit has held that the exhaustion defense "is not ordinarily the proper subject for a summary judgment; instead, it should be raised in a motion to dismiss, or be treated as such if raised in a motion for summary judgment."  *Bryant v. Rich*, 530 F.3d 1368, 1374–75 (11th Cir. 2008) (quotation marks and citations omitted); *see also Trias v. Florida Dep't of Corr.*, 587 F. App'x 531, 536 (11th Cir. 2014) (finding that district court properly construed defendant's motion for summary judgment as a motion to dismiss for failure to exhaust administrative remedies).

Courts follow a two-step process when deciding whether a prisoner has exhausted his administrative remedies.  First, the court

> looks to the factual allegations in the defendant's motion to dismiss and those in the plaintiff's response, and if they conflict, takes the plaintiff's version of the facts as true. If, in that light, the defendant is entitled to have the complaint dismissed for failure to exhaust administrative remedies, it must be dismissed.

*Turner v. Burnside*, 541 F.3d 1077, 1082 (11th Cir. 2008) (citing *Bryant*, 530 F.3d at 1373–74).

If the complaint survives this initial step, the court then makes "specific findings in order to resolve the disputed factual issues related to exhaustion." *Turner*, 541 F.3d at 1082. In this second phase, "[t]he judge . . . may consider facts outside of the pleadings to resolve a factual dispute as to exhaustion where doing so does not decide the merits, and the parties have a sufficient opportunity to develop the record." *Trias*, 587 F. App'x at 535 (citing *Bryant*, 530 F.3d at 1376). The defendant bears the burden of proving that the plaintiff failed to exhaust his administrative remedies. *Turner*, 541 F.3d at 1082. In light of the foregoing, the undersigned will treat Holbrook and Hansen's motion for summary judgment as a motion to dismiss to the extent they argue Woods failed to exhaust his administrative remedies pursuant to 42 U.S.C. § 1997e(a).

The defendants acknowledge that Woods presented an administrative remedy request to the Warden but contend he did not perfect an appeal to the Regional Director after that office directed Woods to resubmit the appeal in the proper format. (Doc. 1 at 42). Instead, Woods appealed to General Counsel where the appeal was rejected because it was submitted at the wrong level. (*Id*. at 44). Additionally, General Counsel concurred with the Regional Director's determination that Woods did not provide the proper documents and directed him to follow the directions provided in the prior rejection notice. (*Id*. at 44). Woods argues the Regional Director "misrepresent[ed]" that he submitted the appeal in an improper format and accuses the office of playing its "usual game of hide and seek." (Doc. 43 at 3). Construing Woods's allegations liberally, he appears to assert that he should be excused from exhausting the administrative remedy process because it was unavailable to him.

"Under § 1997e(a), the exhaustion requirement hinges on the availab[ility] of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." *Ross v. Blake*, 578 U.S. 632, 642 (2016) (quotation marks omitted).  In *Ross*, the Supreme Court listed three circumstances in which an administrative procedure is considered "unavailable" to prisoners: (1) where the administrative procedure "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) where the administrative procedure is "so opaque that it becomes, practically speaking, incapable of use . . . [and] no ordinary prisoner can discern or navigate it"; and (3) when "prison administrators thwart inmates from taking advantage of a grievance procedure through machination, misrepresentation, or intimidation."  *Id*. at 643–44.  The Supreme Court explained further that the ordinary meaning of the word "available" is "'capable of use for the accomplishment of a purpose,' and that which 'is accessible or may be obtained.'"  *Id*. at 642 (quoting *Booth v. Churner*, 532 U.S. 731, 737–38 (2001) (citation omitted)).

Woods asserts that after the Regional Director rejected his appeal, he contacted his Unit Manager, who confirmed the proper documents were submitted.  (Doc. 43 at 3, 29).  Although Woods makes conclusory claims that the Regional Director made "misrepresentations" concerning his appeal as a "delay tactic," (doc. 43 at 3), he does not dispute that the Regional Director afforded him an opportunity to resubmit his appeal, (doc. 1 at 42).  Additionally, General Counsel concurred with the Regional Director's determination that Woods's appeal did not contain the necessary documents and directed Woods to follow the directions provided in the prior rejection notice. (Doc. 1 at 44).

Woods has not described a situation in which prison officials "thwart[ed] inmates from taking advantage of a grievance procedure through machination, misrepresentation, or

14

intimidation." *Ross*, 578 U.S. at 644.   It is clear from the record that Woods was afforded an opportunity to resubmit his appeal to the Regional Director (doc. 1 at 42, 44).   Instead, Woods chose to ignore the Regional Director's instructions altogether and appeal to the General Counsel where his claim was rejected for the same reasons.   (Doc. 1 at 43–44).   Woods does not dispute that he took no further action after this.   Thus, even construing the facts in a light most favorable to Woods under the first step of the exhaustion review, it appears BOP's grievance procedure was available to him.

As stated earlier, a prisoner must exhaust his BOP administrative remedies before he can obtain relief in federal court.   *Shivers v. United States*, 1 F.4th 924, 935–36 (11th Cir. 2021). Because Woods did not perfect his appeal at the regional level before appealing to General Counsel, he did not exhaust his administrative remedies prior to seeking relief in this court. Accordingly, Woods's claims against Holbrook and Hansen are due to be dismissed without prejudice based on 42 U.S.C. § 1997e(a).[12]   *See Krist v. Eichenlaub*, 386 F. App'x 920, 923 (11th Cir. 2010) ("To exhaust his administrative remedies, Krist was required to appeal that determination to the regional director, and then to the general counsel.") (citing 28 C.F.R. § 542.15(a)).

### 2.   Statute of Limitations

Even if Woods properly exhausted his administrative remedies, his *Bivens* claims against Holbrook and Hansen are also barred by the statute of limitations.

---

[12] Generally, constitutional claims that are unexhausted are dismissed without prejudice to a prisoner's re-filing after proper exhaustion unless future attempts to exhaust would be absolutely time barred under the administrative grievance procedure.   *Bryant v. Rich*, 530 F.3d 1368, 1374-75, n.11 (11th Cir. 2008); *see also Johnson v. Meadows*, 418 F.3d 1152, 1157 (11th Cir. 2005). The defendants, who have the burden, have not indicated whether Woods is now time-barred from resubmitting his administrative remedy.   Accordingly, the undersigned recommends Woods's unexhausted *Bivens* claims be dismissed without prejudice.

The proper statute of limitations for a 42 U.S.C. § 1983 action is the forum state's general or residual statute of limitations for personal injury. *See Owens v. Okure*, 488 U.S. 235, 236, 249–50 (1989). A state's personal injury statute of limitations also applies to *Bivens* actions. *See Kelly v. Serna*, 87 F.3d 1235, 1238 (11th Cir. 1996). The residual statute of limitations for personal injury in Alabama is two years.[13] Ala. Code § 6-2-38(*l*).

A limitations period begins to run when a cause of action accrues. *Rozar v. Mullis*, 85 F.3d 556, 561–62 (11th Cir. 1996). In this Circuit, a cause of action ordinarily "will not accrue, and thereby set the limitations clock running, until the plaintiff[ ] know[s] or should know (1) that [he] ha[s] suffered the injury that forms the basis of [his] complaint and (2) who has inflicted the injury." *Chappell v. Rich*, 340 F.3d 1279, 1283 (11th Cir. 2003). Generally, once a limitations period has run, the action is barred, regardless of the merits of the plaintiff's claims. *See generally Arce v. Garcia*, 434 F.3d 1254, 1260–61 (11th Cir. 2006).

Woods's claims against Holbrook and Hansen accrued on January 17, 2018, when Woods knew or should have known that these defendants delayed treatment for his eye injury. Woods did not file this action until April 13, 2020.[14] (Doc. 1 at 13). Although Woods does not expressly

---

[13] Alabama Code § 6-2-38(*l*) provides: "All actions for any injury to the person or rights of another not arising from contract and not specifically enumerated in this section must be brought within two years."

[14] Because a prisoner proceeding *pro se* has virtually no control over the mailing of his pleading, it is deemed to be filed at the time the prisoner delivers the pleading to prison or jail officials to be mailed. *Houston v. Lack*, 487 U.S. 266, 270–72 (1988). Although the record contains no information regarding the date Woods gave his original complaint to prison officials to mail, he signed the complaint April 13, 2020. (Doc. 1 at 13). Woods named the United States as the sole defendant in his original complaint (doc. 1), but did not add Holbrook and Hansen until October 21, 2020. (Doc. 14 at 3). Nevertheless, for purposes of this discussion, the undersigned assumes Woods's claims against Holbrook and Hansen relate back to the date of his original complaint based on Federal Rule of Civil Procedure 15(c)(1) since the amendment "asserts a claim

allege that he is entitled to tolling of the statute of limitations while he pursued his administrative remedies, his claims are still untimely since the Eleventh Circuit has "declined expressly to rule on the issue" of whether the PLRA's exhaustion requirement operates to toll the limitations period. *Zamudio v. Haskins*, 775 F. App'x 614, 616 n.2 (11th Cir. 2019); *see Leal v. Georgia Dep't of Corrs.*, 254 F.3d 1276, 1280 (11th Cir. 2001) ("[W]e decline to decide in the first instance the legal issue of whether the mandatory exhaustion requirement of 42 U.S.C. § 1997e(a) and the actual exhaustion of remedies by a prisoner will operate to toll the statute of limitations."); *Rager v. Augustine*, 760 F. App'x 947, 950 (11th Cir. 2019) ("We've expressly declined to address the question of whether the statute of limitations can be tolled while a prisoner is in the process of exhausting his administrative remedies as a mandatory prerequisite for filing a federal lawsuit."); *Walker v. United States*, 196 F. App'x 774, 777 (11th Cir. 2006) (citing *Leal* in a *Bivens* case). Moreover, Woods has not alleged any facts to support a finding that he benefits from any other tolling provision.  Accordingly, even if Woods exhausted his administrative remedies pursuant to 42 U.S.C. § 1997e(a), his *Bivens* claims against Holbrook and Hansen under *Bivens* are untimely and due to be dismissed with prejudice on that ground.

### B.  FTCA Claims – United States[15]

Woods seeks to hold the United States liable under the FTCA for the actions of medical staff concerning his eye injury.  (Doc. 31 at 1–2).  The FTCA provides a mechanism by which

---

or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading."

[15] The United States does not contend that Woods's FTCA claims are also barred by the statute of limitations.  (Doc. 40).  Under the FTCA, if the agency denies the claim, a claimant must file suit in federal court "within six months" after the date the agency's denial is mailed.  28 U.S.C. § 2401(b).  Woods submitted a letter, dated February 3, 2020, from BOP Deputy Regional Counsel denying his claim.  (Doc. 1 at 15).  Woods filed this action on April 13, 2020.  (Doc. 1 at 13).  Therefore, it appears his FTCA claims are timely.

individuals may recover damages from the United States for personal injury resulting from the negligent or wrongful act or omission of any federal employee.  Specifically, an FTCA claim arises when a federal employee, acting within the scope of his or her office or employment, caused an injury, under circumstances where the United States, if a private person, would be liable to the claimant under the law of the place where the act or omission occurred.  28 U.S.C. §§ 1346(b)(1), 2672.  Therefore, Woods's FTCA claims are governed by Alabama law.

Woods's claims are most analogous to a medical malpractice claim under the Alabama Medical Liability Act ("AMLA"), Ala. Code §§ 6-5-480 to -488, 6-5-540 to -552 (1975).  Alabama Code § 6-5-484(a) of the AMLA states:

> In performing professional services for a patient, a physician's, surgeon's, or dentist's duty to the patient shall be to exercise such reasonable care, diligence, and skill as physicians, surgeons, and dentists in the same general neighborhood, and in the same general line of practice, ordinarily have and exercise in a like case.

Alabama Code § 6-5-548(a) provides:

> In any action for injury or damages or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care, the plaintiff shall have the burden of proving by substantial evidence that the health care provider failed to exercise such reasonable care, skill, and diligence as other similarly situated health care providers in the same general line of practice ordinarily have and exercise in a like case.

Consistent with these provisions, a medical-malpractice plaintiff bears a heavy burden.  "To prevail on a medical-malpractice claim, a plaintiff must prove 1) the appropriate standard of care, 2) the doctor's deviation from that standard, and 3) a proximate causal connection between the doctor's act or omission constituting the breach and the injury sustained by the plaintiff."  *Breland ex rel. Breland v. Rich*, 69 So. 3d 803, 814 (Ala. 2011) (quotation marks and citations omitted).  Generally, "the plaintiff is required to produce expert medical testimony to establish the applicable standard of care and a breach of that standard of care, in order to satisfy the plaintiff's burden of

proof." *Anderson v. Ala. Reference Labs*, 778 So. 2d 806, 811 (Ala. 2000).  A narrow exception to the expert testimony rule exists "where want of skill or lack of care is so apparent . . . as to be understood by a layman, and requires only common knowledge and experience to understand it." *Ex parte HealthSouth Corp.*, 851 So. 2d 33, 38 (Ala. 2002) (quotation marks and citations omitted). The Alabama Supreme Court has recognized four examples that fall within the exception to the expert testimony rule:

> (1) where a foreign instrumentality is found in the plaintiff's body following surgery; (2) where the injury complained of is in no way connected to the condition for which the plaintiff sought treatment; (3) where the plaintiff employs a recognized standard or authoritative medical text or treatise to prove what is or is not proper practice; and (4) where the plaintiff is himself or herself a medical expert qualified to evaluate the doctor's allegedly negligent conduct.

*Anderson*, 778 So. 2d at 811 (quotation marks and citations omitted).

In *Ex parte HealthSouth*, the Alabama Supreme Court explained that *Anderson* examples three and four have nothing to do with an exception for general matters within the common knowledge of a layperson.  851 So. 2d at 38.  Therefore, the Alabama Supreme Court reformulated the *Anderson* approach

> to recognize first, a class of cases where want of skill or lack of care is so apparent . . . as to be understood by a layman, and requires only common knowledge and experience to understand it, . . . , such as when a sponge is left in, where, for example, the wrong leg is operated on, or, as here, where a call for assistance is completely ignored for an unreasonable period of time.  A second exception to the rule requiring expert testimony applies when a plaintiff relies on a recognized standard or authoritative medical text or treatise, . . . , or is himself or herself a qualified medical expert.

*Ex parte HealthSouth*, 851 So.2d at 39 (quotation marks and citations omitted).  With these Alabama medical-malpractice principles in mind, the undersigned turns to Woods's FTCA allegations.

Woods alleges several instances in which prison and medical staff were negligent regarding

his eye injury in January 2018.  First, he contends Mourtada, Holbrook, and Hansen delayed referring him to an outside specialist, despite their knowledge that he was in severe pain and the prescribed medications were ineffective.  (Doc. 26 at 13–15, Woods Aff.).  He further alleges that when Holbrook finally acquiesced to transferring him to the emergency room, Holbrook and Hansen neglected to give Officers Sanders and Taft proper escorting instructions.  (*Id.*).  As a result, Sanders and Taft took Woods to the wrong emergency room where he remained in restraints for several hours before learning they were in the wrong facility.  Woods also asserts prison and medical staff failed to supply him with a winter coat before he was taken to the emergency room, and Sanders and Taft refused to remove the C&S cover on his handcuffs while they waited hours in the wrong emergency room, all of which could have exacerbated his sickle cell anemia.  (Doc. 26 at 12, 15, 16, Woods Aff.).

As an initial matter, the subject of Woods's FTCA claim is the eye injury he sustained in January 2018, and the undersigned's analysis is limited to the alleged delay in treating Woods's eye injury.  (Doc. 1 at 15).  Because of this FTCA focus, allegations unrelated to Woods's eye do not advance his claim against the United States and will not be addressed.  Concerning Woods's complaints that he was transferred without a winter coat in cold conditions, Holbrook states that BOP policy does not require sickle cell anemia patients to be escorted with coats.  (Doc. 40-3, Holbrook Decl. ¶ 13).  Although Woods claims Dr. Lawrence previously ordered that he not be exposed to any amount of "excess cold/wind," (doc. 43 at 2, 19), Woods has not cited any medical evidence to support this allegation.  Additionally, Woods has not cited any medical evidence that connects his exposure to the cold to his eye injury.  Similarly, Woods has not referred to medical evidence that Taft's failure to remove the C&S handcuff cover exacerbated his eye injury.  While

Woods was undoubtedly cold and uncomfortable, he does not allege how this discomfort affected his eye injury.

According to Dr. Holbrook, the medical record establishes Woods was treated with evidence-based, proven effective medical care in accordance with medical standards and at no time were BOP staff negligent in the medical care Woods received. (Doc. 40-3, Holbrook Decl. ¶¶ 10, 14). Holbrook contends Mid-Level Practitioner Mourtada examined Woods, considered his complaints, and referred him for an urgent ophthalmologist consult. (*Id.* ¶ 10). Holbrook states that the referral was urgent but Woods's condition at the time did not necessitate emergency treatment. (*Id.*). However, the following day, when Woods reported a sudden and significant change in visual acuity, he was transferred to the emergency room for further evaluation and treatment. (*Id.*). Holbrook explains that the "reported sudden change in visual acuity elevated [Woods's] need for treatment from urgent to emergent, and he was properly referred for treatment in the emergency room." (*Id.*).

Woods has provided no expert testimony in opposition to Dr. Holbrook's sworn declaration that he and other medical staff provided appropriate care in treating Woods's eye injury. Moreover, no exception to Alabama's expert testimony rule applies to Woods's contention that medical staff breached the standard of care and the breach was the cause of his injury.

Woods contends that after he reported his condition to Lieutenant Dougherty on the evening of January 17, 2018, Dougherty directed Nurse Honer to examine Woods immediately. (Doc. 31 at 4). To the extent Woods argues his medical condition was obvious enough to Lieutenant Dougherty, a layman, so as not to require expert evidence (doc. 26 at 11), he fails to make such a showing. *See Anderson*, 778 So. 2d at 811; *Ex parte HealthSouth*, 851 So. 2d at 39. It is undisputed that Woods, who had undergone a retinal implant two years before (doc. 40-3, Holbrook Decl. ¶

21

6), experienced severe pain in his eye and decreased visual acuity, and was subsequently diagnosed with endophthalmitis, and a corneal ulcer of the right eye.  (*Id.* ¶ 11).  But other than his own conclusory statements, Woods has not offered any evidence that the mode of treatment under these medical circumstances is a matter of common knowledge or within the general experience of a layman. Therefore, expert testimony is necessary to establish the applicable standard of care and to show how the care Woods received breached that standard and caused his injury.[16]  *See Anderson*, 778 So. 2d at 811.

When the standard of care is not apparent to a layperson, the failure to provide expert testimony "results in a lack of proof essential to a medical malpractice plaintiff's case" under Alabama law.  *Pruitt v. Zeiger*, 590 So. 2d 236, 238 (Ala. 1991).  Likewise, Holbrook's showing that the appropriate standard of care was followed concerning Woods's medical treatment for his eye injury requires Woods to counter with expert medical evidence sufficient to create a genuine issue of material fact of AMLA liability.  Woods has failed to do so.

### 1.  Motion for Appointment of Medical Expert

Recognizing that he cannot sustain his burden of proof without one, Woods moves for the appointment of a medical expert.  (Doc. 43 at 3–4).  Rule 706(a) of the Federal Rules of Evidence provides that the district court may appoint an expert witness either on its own motion or the request of a party.  The Eleventh Circuit has noted that "[s]uch an appointment is especially appropriate where the evidence of testimony at issue is scientifically or technically complex."  *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1348 (11th Cir. 2003).  "Where a party requests the appointment of an expert to aid in evaluating evidence that is relevant to a

---

[16] In fact, Woods agrees with the defendants that these conditions warrant expert testimony to determine whether medical staff breached the standard of care.  (Doc. 43 at 3).

central issue in the case, the court is obligated to fairly consider the request and to provide a reasoned explanation for its ultimate decision on the matter." *Id*.  Nevertheless, the Court has observed that it is "unfamiliar with any set of circumstances under which a district court bears an affirmative obligation to appoint an independent expert.'" *Quiet Tech.*, 326 F.3d at 1348; *see also Rodriguez v. Powell*, 853 F. App'x 613, 620 (11th Cir. 2021) (quoting *Quiet Tech*, 326 F.3d at 1348).

This court has held that factors to consider in the appointment of a Rule 706 expert in medical-care cases include: "the strength of the plaintiff's non-expert evidence relating to a medical claim; the seriousness of the medical issue involved; and the degree to which expert testimony might be dispositive of (or important to) the case." *Gillentine v. Corr. Med. Servs., Inc.*, No. 5:11-cv-2694-RDP-TMP, 2014 WL 5795553, at *4 (N.D. Ala. Nov. 6, 2014); *see Paseur v. United States*, No. 1:20-cv-1189-AMM-SGC, 2021 WL 4434971, at *6 (N.D. Ala. Aug. 10, 2021), *report and recommendation adopted*, 2021 WL 4409094 (N.D. Ala. Sept. 27, 2021).

Turning to the first factor, Woods's non-expert evidence concerning medical and prison officials' delay in transferring him for additional treatment weighs in his favor.  Included in the record are documents detailing Woods's eye injury at its onset; prison medical staff's treatment of Woods prior to his transfer to Callahan Eye Hospital; notes from Woods's surgery and hospital stay; and the care Woods received once he returned to the prison, including follow-up office appointments at Callahan.  (Doc. 41-1 at 11–104).  On the morning of January 17, 2018, Woods informed Dr. Holbrook and Hansen that his eye condition had deteriorated, and he was experiencing pain, pressure, and light sensitivity. (Doc. 26 at 14; Doc. 31 at 3–4).  During the examination, Holbrook noted an inability to fully visualize the retina but did observe a "white stitch appearing substance" that protruded about 1/16–1/8 inch from the lateral aspect of Woods's

right eye at the outer border of the iris.  (Doc. 40-3, Holbrook Decl. ¶ 7).  The examination also revealed Woods had mild erythema over the sclera of the right eye.  (*Id*.).  His visual acuity was 20/70.  (*Id*.).  Later that evening, Woods asserts his pain level increased and his eye felt as if it was "tearing itself apart."  (*Id*.).   Nurse Honer examined Woods about 6:14 p.m.  (Doc. 40-3, Holbrook Decl. ¶ 9).  Honer noted that Woods complained of a "different feeling" in his right eye, including pain, pressure, and loss of vision.  (Doc. 41-1 at 35).  And Honer's examination noted a change in the visual acuity of Woods's right eye from 20/70 at 9:48 a.m. to 20/200 that evening.  (Doc. 26 at 15, Woods Aff.; Doc. 41-1 at 35; Doc. 40-3, Holbrook Decl. ¶ 9).

Moreover, the medical evidence indicates Woods's visual acuity decreased again from 20/200 to 20/400 between the time Honer evaluated him and when he reached Callahan Eye Hospital, after guards failed to take him to the right emergency room thereby delaying him treatment for several additional hours.  (Doc. 41-1 at 35, 94).  Based on the foregoing, Woods's non-expert evidence demonstrates that medical staff's delay in approving him for outside treatment and prison staff's delay in escorting him to the correct emergency room could have exacerbated his injury and caused him to endure additional hours of pain.

The second factor—the seriousness of the medical issue involved—also weighs in Woods's favor.  Woods had a preexisting diagnosis of sickle cell retinopathy, which put him at high risk for retinal issues and decreased vision as a result.  (Doc. 40-3, Holbrook Decl. ¶ 12).  According to a UAB Ophthalmology note dated January 25, 2018, Woods underwent a TRD repair/CEIOL (traditional retina detachment repair, cataract excision surgery) in or about 2015 and had two sutures left in place.  (Doc. 40-3, Holbrook Decl. ¶ 6, n.1; Doc. 41-1 at 87, 89).  After Woods began experiencing decreased vision and pain on or about January 18, 2018, Callahan Eye Hospital medical staff subsequently diagnosed him with endophthalmitis, "likely from a broken suture at

temporal wound." (Doc. 41-1 at 95).  Woods underwent surgery and his post-operative diagnosis was endophthalmitis and a corneal ulcer of the right eye.  (Doc. 40-3, Holbrook Decl. ¶ 11).  Thus, there is no real debate between the parties that Woods's suffered a serious medical condition.

Considering the third factor, expert testimony is necessary to the success of AMLA claims generally, as discussed herein, and is therefore important to Woods's claims here.

Based on the foregoing, the undersigned finds that the three *Gillentine* factors weigh in Woods's favor for granting his motion for appointment of a Rule 706 expert.  (Doc. 43 at 3–).  Because Woods has established a need for appointment of an expert to evaluate relevant evidence central to his FTCA claims, the undersigned recommends the court deny without prejudice the United States's motion for summary judgment on those claims, with leave to refile.

### 2.  Motion for Appointment of Counsel

Woods also moves for appointment of counsel  (Doc. 43 at 4–5).  The appointment of counsel in a civil matter is a privilege justified only by exceptional circumstances.  *See Fowler v. Jones*, 899 F.2d 1088, 1096 (11th Cir. 1990); *Vickers v. Georgia*, 567 F. App'x 744, 749 (11th Cir. 2014).  Because Woods has satisfied the relevant factors for appointment of an expert witness, the undersigned concludes that exceptional circumstances warrant appointment of counsel.  *See Kilgo v. Ricks*, 983 F.2d 189, 193 (11th Cir. 1993) (noting "key is whether the *pro se* litigant needs help in presenting the essential merits of his or her position to the court").  Accordingly, the undersigned recommends the court grant Woods's motion for appointment of counsel (doc. 43 at 4–5), and his motion for appointment of an expert (doc. 43 at 3–4), to the extent that counsel be permitted to seek an expert on his behalf.

## V.  Recommendation

For these reasons, the undersigned **RECOMMENDS** the following:

1.   The court **GRANT** defendants Holbrook and Hansen's motion to dismiss Woods's *Bivens* claims based on failure to exhaust administrative remedies under 42 U.S.C. § 1997e(a) and the claims be **DISMISSED WITHOUT PREJUDICE**;

2.   In the alternative, the court **GRANT** Holbrook and Hansen's motion for summary judgment because Woods's *Bivens* claims are barred by the statute of limitations and the claims be **DISMISSED WITH PREJUDICE**;

3.   The court **DENY WITHOUT PREJUDICE** defendant United States's motion for summary judgment on Woods's FTCA claims, with leave to refile;

4.   The court **GRANT** Woods's motion for appointment of counsel; and

5.   The court **GRANT** Woods's motion for appointment of an expert, to the extent counsel be permitted to seek counsel on Woods's behalf.

## VI.  Notice of Right to Object

Any party may file specific written objections to this report and recommendation.  Any objections must be filed with the Clerk of Court within **14 days.**  The objecting party must identify every objectionable finding of fact or recommendation and state the specific basis for every objection.  The objecting party also must identify every claim in the complaint that the report and recommendation has not addressed.  Objections should not contain new allegations, present additional evidence, or repeat legal arguments.

A party who fails to object to factual or legal conclusions in the Magistrate Judge's report and recommendation waives the right to challenge on appeal those same conclusions adopted in the District Judge's order.  Without a proper objection, however, the court on appeal may review

the unobjected-to factual and legal conclusions for plain error if necessary in the interests of justice. 11th Cir. R. 3-1.

After receiving the objections, a District Judge will conduct a *de novo* review of the relevant portions of the report and recommendation and may accept, reject, or modify in whole or in part the Magistrate Judge's findings of fact and recommendations.  The District Judge will conduct a hearing if required by law and may exercise discretion to conduct a hearing or otherwise receive additional evidence.  Otherwise, the District Judge may consider the record developed before the Magistrate Judge in making an independent determination of the relevant legal issues. The District Judge also may refer this action back to the Magistrate Judge with instructions for further proceedings.

A party may not appeal the Magistrate Judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit.  A party may appeal only from a final judgment entered by a District Judge.

DONE this 19th day of January, 2023.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE